UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| BETTY JO WOODARD and ARTHUR EDWARD WOODARD, individually, and as next of friend for JESSE LEE WOODARD, a minor, and as heirs at law of the Estate of JESSE RAY WOODDARD | § § § § § § § | |
| v. | § § § | CIVIL ACTION NO.   3:12-cv-95 |
| CHARLES DANIEL ADAMS, MD, RICARDO VICTORIA, MD, BRAZORIA COUNTY, CHARLENE COLE, RN, JOSEPH CONNER, LVN, SUSAN HAMLET, LVN, DEBBIE KISSINGER, LVN, F/N/U SANDOVAL, PA, and F/N/U ABRAHAM, PA | § § § § § § § § § | |

**PLAINTIFFS' COMPLAINT**

Plaintiffs Betty Jo Woodard and Arthur Edward Woodard, respectfully file this complaint and would show the Court and Jury the following:

**I.    JURISDICTION AND VENUE**

1. This Court has jurisdiction over the federal claim pursuant to 28 U.S.C. § 1331 and/or § 1343.

2. Venue is proper in this district pursuant to 24 U.S.C. § 1391(b), as the events complained of occurred in this district and division.

**II.    PARTIES**

3. Plaintiff Betty Jo Woodard is the surviving mother of Jesse Woodard, deceased. She sues in her individual capacity as a wrongful death beneficiary, and as heir at law to the Estate of Jesse Woodard, deceased. Ms. Woodard is a resident of Brazoria County, Texas.

4. Plaintiff Arthur Edward Woodard, Jesse Woodard's father, sues in his individual capacity as a wrongful death beneficiary, and as heir at law to the Estate of Jesse Woodard, deceased. He is a resident of Brazoria County, Texas.

5. At all relevant times, Charles Wagner was the Brazoria County Sheriff. As such, Wagner was the commanding officer of all Brazoria County sheriff's deputies, jailers, jail employees, and contractors and was responsible for their training, supervision, and conduct. By law, he was responsible for ensuring that the custody, safekeeping, medical needs, and housing of all detainees at the jail, including Jesse Woodard, were undertaken in compliance with the laws of the United States and Texas. At all relevant times, Wagner was acting under color of law. Brazoria County is a political subdivision of the State of Texas. The County funds and operates the jail and is charged with ensuring that, at all times, the jail remains in compliance with federal and state law. The County is sued solely under federal law and may be served through County Judge E.J. "Joe" King.

6. At all relevant time, F/N/U Abraham, P.A., was a licensed Physician's Assistant working Brazoria County Jail. She is sued in her individual capacity under federal law.

7. At all relevant times, Charles Daniel Adams, MD was a health care provider who treated Jesse Woodard at the Brazoria County Jail. He may be served at 2 Circle Drive, Sugar Land, Texas 77478. He is sued in his individual capacity under federal law.

8. At all relevant times, Charlene Cole, RN was a registered nurse working at the Brazoria County Jail. She is sued in her individual capacity under federal law.

9. At all relevant time, Joseph Conner was a licensed vocational nurse working at the Brazoria County Jail. He is sued in his individual capacity federal law.

10. At all relevant time, Susan Hamlet was a licensed vocational nurse working at the Brazoria County Jail. She is sued in her individual capacity under federal law.

11. At all relevant time, Debbie Kissinger was a licensed vocational nurse working at the Brazoria County Jail. She is sued in her individual capacity under federal law.

12. At all relevant time, F/N/U Sandoval, P.A. was a licensed Physician's Assistant working at the Brazoria County Jail. She is sued in her individual capacity under federal law.

13. At all relevant times, Ricardo S. Victoria, MD was a health care provider who treated Jesse Woodard at the Brazoria County Jail.

### III. STATEMENT OF FACTS

14. Jesse Woodard was a 27-year-old man with a history of hypertension, seizures, amd when he entered the Brazoria County Jail (BCJ) on March 28, 2010. He had been in the BCJ numerous times in the past, and been treated for a seizure disorder with Dilantin, and was well known by employees at the jail and the jail's health care providers to have a seizure disorder.

15. Mr. Woodard arrived at BCJ on March 28, 2010.

16. Mr. Woodard's *Intake Medical Record* from BCJ reveals that his blood pressure was 157/86 and his pulse was 78.

17. Licensed Practical Nurse (LVN) Kissinger, the intake nurse at the jail, documented that Mr. Woodard stated he was taking Klonopin, Xanax (another benzodiazepine), Seroquel (a psychiatric medication), and Cymbalta (another psychiatric medication) for anxiety and bipolar disorder.

18. She did not note the amount or dosages of any of these medications. Upon information and belief, it was the practice at the BCJ not to do so.

19. LVN Kissinger further noted that Mr. Woodard had a history of seizures from drug withdrawal and did not have epilepsy. She ordered a bottom bunk and referred his chart to a provider for review. However, upon information and belief, and as was the practice of the

3

BCJ, no providers reviewed his chart at this time

20. Thus, Mr. Woodard was not monitored for his seizure condition nor given appropriate medication for his withdrawal.

21. On March 30, 2010, blood pressure checks, two times per day for 7 days, were ordered. However, no provider addressed his seizure history or risk of withdrawal from his medications.

22. On the evening of March 31, 2010, Mr. Woodard's blood pressure was elevated (180/87) and his pulse was dangerously elevated (129).

23. LVN Burke also documented that Mr. Woodard was feeling light-headed.

24. After LVN Burke contacted Physician Assistant (PA) Abraham, Abraham gave telephone order for one dose of clonidine (a medication used to treat hypertension and also to treat some of the symptoms of opiate withdrawal). However, she did not order any follow-up.

25. The following morning, April, 1, 2010, custody staff brought Mr. Woodard to the medical clinic as he was complaining of chest pain.

26. PA Sandoval appears to have evaluated Mr. Woodard at that time.

27. PA Sandovol's progress note form documents that Mr. Woodard had been seen in the past for chronic care of his seizure disorder (first observed on 11/11/2006) and for hypertension (first observed 4/7/08).

28. PA Sandoval did not obtain any further history related to his chest pain other than to note that it was a "recent symptom". She further noted that Mr. Woodard "also wants his Klonopin."

29. Her assessment was chest pain and "possible withdrawal from Klonopin." Thus, PA Sandovol and the other health care provider defendants each knew that Mr. Woodard was experiencing withdrawl and needed medical care for that and his seizure disorder.

4

30. But PA Sandovol did not order any monitoring or treatment for his possible withdrawal. She also did not address his documented history of seizures and hypertension or accomadate his request for Klonopin.

31. Later that evening, LVN Conner saw Woodard for his blood pressure check. LVN Conner noted that custody staff reported that Mr. Woodard was "defecating on himself" and that Mr. Woodard stated that he took Klonopin for his seizure disorder.

32. LVN Conner also noted that Mr. Woodard's blood pressure was elevated (133/90); his pulse was elevated (107); and that he had the odor of stool on him. Thus, even though, LVN Conner knew Mr. Woodard needed to see medical and mental health providers, and knew such were needed, LVN Conner did not refer Mr. Woodard for appropriate care.

33. The following morning, April 2, 2010, Mr. Woodward's blood pressure was 181/86 and his pulse was 97. Later that evening, his blood pressure was 152/72 and his pulse was 106.

34. Yet, on information and belief, no mental health or medical provider reviewed Mr. Woodard's medical record on April 2, 2010.

35. The next morning, April 3, 2010, LVN Hamlet saw Mr. Woodard for his scheduled blood pressure check. She documented that his blood pressure was 171/92 and that his pulse was very elevated (142).

36. She also noted that Mr. Woodard took Klonopin in the free world for anxiety and blood pressure control and Cymbalta for anxiety. She observed that his hands were "shaking/jerking."

37. As a consequence, LVN Hamlet contacted Dr. Victoria and received a telephone order for blood pressure medications and blood pressure checks.

38. Dr. Victoria did not address Mr. Woodard's markedly increased pulse.

39. Moreover, Dr. Victoria did not order any monitoring or treatment for his drug withdrawal despite his increased blood pressure and pulse and tremors.

40. At approximately 3:15 PM that afternoon, Mr. Woodard had a seizure and was taken to the infirmary.

41. Again, the nurse who responded documented that Mr. Woodard had a history of drug withdrawal seizures and also of a seizure disorder – all of which was well known to the jail staff and Mr. Woodard's medical providers – including the defendants.

42. Dr. Victoria advised LVN Hamlet to transfer Mr. Woodard to the local emergency room for his altered mental status but to check with Dr. Adams prior to the transfer.

43. Registered Nurse (RN) Cole, the nurse manager, contacted Dr. Adams.

44. Rather than send the seriously ill Woodard to a hospital, however, Dr. Adams overruled Dr. Victoria and kept him at the jail – a decision that would ultimately lead to tragedy.

45. By this point, Mr. Woodard was well known to have seizures from withdrawal.

46. Despite this fact, Dr. Adams did not order any monitoring or treatment of Mr. Woodard's drug withdrawal.

47. Despite the severity of his condition and the need for monitoring and medicine, Mr. Woodard was discharged from the infirmary the following day at approximately 12:30 PM.

48. He had not seen a medical provider on April 4, 2010 prior to his discharge on April 4, 2010, despite the fact that it was known to defendants, including but not limited to Dr. Adams and the nursing staff, that he needed to see one.

49. In any event, at approximately 2:45 PM that afternoon, Mr. Woodard had another seizure and returned to the infirmary.

50. LVN Hamlet left two telephone messages for Dr. Victoria, but neither Dr. Victoria nor any other doctor returned her call.

51. Nurse Hamlet did, however, receive a call from Mr. Woodard's father informing her that his son was in a methadone program and that he had withdrawal seizures when he did not take his medications.

52. Despite this knowledge and despite the dangerous state in which Mr. Woodard remained, nothing was done to help Mr. Woodard get to a hospital for treatment.

53. At 6:00 PM that evening, LVN Kissinger observed that Mr. Woodard's blood pressure was 144/83 and that his pulse was 103. She saw that he was sweating and was experiencing recurrent seizures and tremors every 10-20 minutes.

54. However, LVN Kissinger did not contact a doctor or appropriate medical provider at that time. Instead, she left him to continue seizing.

55. At 7:00 PM, LVN Kissinger documented that Mr. Woodard's blood pressure was 171/77; his pulse was 108; his oxygen saturation was 92%; he had urinated on himself and that, upon information and belief, he was continuing to have seizures every 10-20 minutes, and required a sternal rub to be aroused.

56. Despite the life threatening illness facing Mr. Woodard, Kissinger left him in the jail infirmary to continue to seize.

57. Finally, at 7:30 PM, LVN Kissinger contacted Dr. Adams.

58. She informed him of Mr. Woodard's recurrent seizures; that his chest was congested; that he was diaphoretic; and that his oxygen saturation had decreased down to 73%.

59. Shockingly, Dr. Adams failed to immediately transfer Mr. Woodard to the hospital emergency room.

60. In other words, Dr. Adams was made aware that Mr. Woodard was experiencing life threatening seizures, and he did not transfer him to the hospital.

61. Upon information and belief, Dr. Adams failed to transfer Mr. Woodard because

of the expense associated with such transfers.

62.  At 8:20 PM, LVN Kissinger noted that she cleaned Mr. Woodard "with warm damp towels to remove sweat and urine" and that his clothes and bedding needed replacement.

63.  At 8:45 PM, she again told Dr. Adams that Mr. Woodard continued to have recurrent seizures every 10 minutes; that he was hard to arouse; and that his tremors continued.

64.  Incredibly, despite the life threatening condition facing Mr. Woodard, Dr. Adams again failed to transfer Mr. Woodard to the hospital.

65.  Instead, he advised her to merely administer Ativan at a dose of 2 mg intramuscularly (an insignificant amount given Mr. Woodard's state) and to continue oxygen.

66.  Upon information and belief, Dr. Adams' decision not to send Mr. Woodard to the hospital was motivated by financial considerations.

67.  At 9:15 PM, LVN Kissinger further documented that Mr. Woodard's seizure activity and tremors continued and that his oxygen saturation was 92%. Despite these life-threatening conditions, she did not contact Dr. Adams at this time.

68.  Thus, Mr. Woodard's recurrent seizure activity continued and he remained in grave danger.

69.  At 10:15 PM, Mr. Woodard was not breathing. After custody staff notified LVN Kissinger, she confirmed that Mr. Woodard was nonresponsive with absent vital signs and fixed and dilated pupils.

70.  Only then did she instrict the custody staff to call 911 for an ambulance.

71.  At approximately 10:40 PM, EMS transported Mr. Woodard to the Angleton Danbury Hospital emergency room via ambulance.

72.  Resuscitative efforts were not successful and were discontinued.

73.  Following an autopsy, the Medical Examiner determined the cause of death to be

seizure disorder and hypertensive cardiovascular disease.

74. Had the defendants simply gotten Mr. Woodard to the hospital when they should have, Mr. Woodard would still be alive.

75. Accordingly, Plaintiffs bring this lawsuit not only to hold defendants accountable for the death of their son, but also so that detainees are treated humanely in the future.

## V. CAUSES OF ACTION

### A. FEDERAL CLAIMS

#### 1. §1983 Claims Against Defendants Kissinger, Abraham, Sandovol, Conner, Victoria, Adams, Cole, and Hamlet in their individual capacities.

76. Plaintiffs incorporate the foregoing allegations as if set forth below, and further allege:

77. At all relevant times, Jesse Woodard had a serious medical condition and illness that required treatment.

78. As explained herein, Defendants Kissinger, Abraham, Sandovol, Conner, Victoria, Adams, Cole, and Hamlet displayed deliberate indifference to Woodard's serious medical needs.

79. More particularly, Defendants Kissinger, Abraham, Sandovol, Conner, Victoria, Adams, Cole, and Hamlet knew that Mr. Woodard's seizure disorder and recurrent seizures were a serious illness and required treatment, knew that Woodard was suffering from withdrawal and a seizure disorder, yet they did nothing to get him properly medicated, evaluated, or to a hospital. Thus, they essentially ignored a life threatening illness and watched a man die from an easily preventable illness.

80. As a direct and proximate result of Defendants Kissinger, Abraham, Sandovol, Conner, Victoria, Adams, Cole, and Hamlet's deliberate indifference, Mr. Woodard died. Accordingly, these defendants are liable under 42 U.S.C. § 1983 for Plaintiffs' damages, as their actions and omissions violated Jesse Woodard's clearly established right under the 14th

Amendment not to have his serious medical needs treated with deliberate indifference.

### 2. §1983 Claim Against Brazoria County

81. Plaintiffs incorporate the foregoing allegations as if set forth below, and further allege:

82. Brazoria County operated the Brazoria County Jail and receives federal funds.

83. The Brazoria County official responsible for operating the jail and its policymaker concerning the jail's operation was Sheriff Charles S. Wagner.

84. At the time of Jesse Woodard's detention, Brazoria County had the following policies at its jail:

- Inadequate training and protocols concerning the treatment of withdrawal or seizures;

- Prohibiting needed medications from being prescribed, including benzodiazapenes needed to treat seizures and/or withdrawal;

- Inadequate training and protocols concerning intake of individuals experiencing withdrawal, seizure disorder, or serious medical needs.

- Permitting LVNs to practice beyond their legal scope of practice;

- Inadequate supervision of inmates or detainees suffering from withdrawal and/or seizures, and of providers treating such individuals;

- Failing to refer and/or discouraging referral of inmates or detainees in need of emergency care to appropriate outside facilities.

85. Each of the above policies and/or practices were well known to Brazoria County policymakers, including Sheriff Wagner and certainly should have been known to Sheriff Wagner and the County's policymakers.

86. Likewise, the individual defendants were aware of the above practices.

87. Moreover, withdrawal and seizures are a very common problem in jails, including the Brazoria County Jail. Thus, it is well known that custody and medical staff in correctional

facilities must have policies and procedures for the medical supervision or individuals at risk for withdrawal and seizures in order to prevent severe withdrawal problems and serious injuries. In facilities where medical providers are on site, as is the case in Brazoria County, staff must be trained to recognize the signs and symptoms of withdrawal and have clear guidelines on which signs and symptoms require referral to a qualified health care professional and require transfer to a higher level of care.

88. At the time of this incident, however, upon information and belief the Brazoria County Jail had inadequate protocols concerning withdrawal and the treatment of recurring seizures and did not provide adequate training to its staff concerning such. Moreover, transfers to the emergency room or outside hospital were discouraged for financial reasons.

89. Thus, the policies delineated above were not only known to Captain Hain and Brazoria County's policymakers, including but not limited to Charles S. Wagner, they were adopted with deliberate indifference to inmates and detainees' rights to adequate medical care and not to have serious medical needs treated with deliberate indifference. Moreover, the known and obvious consequence of the policies delineated above are that inmates and detainee's serious medical needs, including treatment for withdrawal and recurrent seizures, would go untreated or be treated with deliberate indifference, and that serious injury, including death, would result.

90. Thus, the policies delineated above were a proximate cause and/or the moving force of Jesse Woodard's death and Plaintiffs' damages.

## VI.   DAMAGES

136. As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and were the moving force of the wrongful death of Jesse Woodard, Deceased,

Plaintiffs assert claims under 42 U.S.C. § 1983 and the wrongful death and survivorship statutes as specifically pled herein.

137. More particularly, Plaintiffs Betty Jo Woodard and Arthur Woodard, in their capacity as heirs at law to the Estate of Jesse Woodard, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

138. Plaintiffs Betty Jo Woodard and Arthur Edward Woodard in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection Jesse Woodard; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

### VII. ATTORNEYS' FEES AND COSTS

139. Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs including expert fees, and so claim.

### VIII. PRAYER FOR RELIEF

THEREFORE, Plaintiffs request that the Court:

A. Award compensatory damages against Defendants;

B. Find that Plaintiffs are the prevailing parties in this case and award them attorneys'

fees, court costs, and litigation expenses including but not limited to expert fees under 42 U.S.C. §1988;

  C. Award pre-judgment and post-judgment interest at the highest rate allowable under the law;

  D. Award Costs of Court; and

  E. Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled.

          Respectfully submitted,

          The Edwards Law Firm
          The Bremond Houston House
          706 Guadalupe
          Austin, Texas 78701
          Tel. 512-623-7727
          Fax. 512-623-7729

          By /s/ Jeff Edwards
          JEFF EDWARDS
          State Bar No. 24014406

          **ATTORNEY FOR PLAINTIFFS**